FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JAN 27  AM 10: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

DRILL SOUTH, INC.,                          )
                                            )
    Plaintiff(s),                       )
                                            )
    vs.                                 )       CV-96-N-2682-S
                                            )
INTERNATIONAL FIDELITY                      )
INSURANCE COMPANY,                          )
                                            )
    Defendant(s).                       )

ENTERED
JAN 27 1999

MEMORANDUM OF OPINION

I.    Introduction.

    Like the phoenix from ashes, this matter has taken new life and the lawyers new

hope in yet another round of the "Litigation Game." The court has twice tried to finalize

judgment in this case, only to have the lawyers rise again, alive and kicking. Hopefully, with

luck, hard work, and divine intervention, the court's latest effort to end the matter will

succeed and the case will not live another 500 years.[1]

    The court currently has for consideration the plaintiff's motion for an award of

additional costs and attorneys' fees, filed September 19, 1997. This motion, which as far as

the court can discern represents the last on-going dispute in this action, has been

thoroughly briefed. The court heard evidence and oral argument on October 29, 1998, and

the issues are now ripe for resolution.

---

    [1]The phoenix comes to us from ancient Egypt and classical antiquity. It was said to be a bird as large as an eagle with brilliant scarlet and gold plumage and a musical call. There could be only one at any given time, but that one lived at least 500 years. At the end, the phoenix died in a fire of its own making that was fed by aromatic boughs and spices. Miraculously, from the ashes there arose a new phoenix to live another 500 years. Mixing metaphors and legends, it is the court's intention to finally drive a stake through the heart of this case. If this phoenix is to again rise from its ashes it will be with the aid of a court higher than this one.

/44

**II.    Factual Background.**

The facts underlying this litigation have been set out in the court's earlier opinions and will not be restated *in extenso* here. In this Miller Act case, the original plaintiff, United States of America, for the use of Miller Drilling Co., Inc. ("Miller Drilling"), a subsubcontractor, brought claims against its subcontractor Drill South, Inc. ("Drill South"), the general contractor Enviro-Group, Inc. ("Enviro-Group"), and Enviro-Group's surety International Fidelity Insurance Company ("IFC"), pursuant to 40 U.S.C. §§ 270a, 270b (the "Miller Act") and Alabama law. Drill South and IFC each then brought cross claims against Enviro-Group. The Clerk of the Court entered default judgments against Enviro-Group in favor of both Miller Drilling and Drill South on April 7, 1997. Upon proof of damages, judgment was then entered for Drill South in the amount of $151,760.30 in damages and $14,353.54 in attorneys' fees. These fees were awarded pursuant to a clause in the subcontract between Drill South and Enviro-Group which provided that "[i]n the event any action is taken by a party to this Agreement to enforce its terms, including the commencement of . . . litigation, all reasonable attorney's fees, litigation expenses and costs . . . shall be paid or reimbursed by the other party." *Subcontract*, ¶ 21.2

Miller Drilling's claims were dismissed on May 27, 1997, due to a settlement between the parties, and the parties were realigned such that Drill South is now the plaintiff and IFC is now the defendant. On September 5, 1997, the court concluded that IFC, as Enviro-Group's surety, was bound by the default judgment which had been entered against Enviro-Group. Judgment was therefore entered against IFC in amounts which mirrored the

2

default judgment entered against Enviro-Group. This included $14,353.54 in fees and costs representing the expense of litigating against Enviro-Group prior to the entry of default.

A flurry of post-judgment motions followed the entry of this judgment. First, IFC sought to alter or amend the judgment pursuant to Rule 59(e). The court denied this motion on September 30, 1997, but reserved for consideration the question of whether the court's September 5, 1997, judgment should be altered from the $151,760.30 originally entered to reflect the $71,465.88 (the "set-off" amount) IFC previously had paid to Miller Drilling as the subsubcontractor of Drill South. At roughly the same time, on September 19, 1997, Drill South moved for an award of the costs and attorneys' fees incurred in its attempts to hold IFC accountable for the amount of its judgment against Enviro-Group.

On October 21, 1997, IFC, the only remaining defendant in this cause, filed an appeal to the Eleventh Circuit. However, the Eleventh Circuit, after holding the matter for many months, concluded that IFC's appeal was premature, and that jurisdiction could not be shifted to the court of appeals until the remaining post-trial motions were disposed of. *See Fed. R. App. P. 4(a)(4)*. Only Drill South's motion for attorneys' fees, and specifically for the fees incurred in litigating against Drill South *after* default judgment was entered against Enviro-Group, remains for the court's consideration.[2]

Drill South's counsel, Smith and Fleming, has submitted into evidence its billing records and various breakdowns of the time spent for which it seeks recompense. While this information is somewhat difficult to interpret, as best the court can tell Drill South now

---

[2] The parties have been given bounteous opportunities to call the court's attention to any other issues that might prevent the issuance of final judgment in this case. They have raised none. The court therefore considers that any additional objections, protests, claims, issues, and gripes have been affirmatively waived.

3

seeks to recover for a total of 453.5 hours of work. Two attorneys did most of the work on the case. The time for one partner with more than twenty years of construction litigation experience has been billed at $140 per hour. The time for the other, a senior associate with seven years of experience in the same field, has been billed at $115 an hour. A junior associate also billed a few hours of work at $100 an hour. *Aff. of Peter Crofton*,[3] ¶¶ 4-6. Drill South has also agreed to pay its counsel a contingent fee amounting to ten percent of the amount recovered in excess of the original unpaid contract balance. Drill South calculates this contingency fee to be $10,288.70. *Id.* ¶ 16.

## III. Discussion.

The parties dispute both Drill South's entitlement to additional attorneys' fees and the appropriate amount of any such fees. With respect to the former issue, IFC contends that Drill South was entitled only to those fees incurred in litigation against Enviro-Group prior to the entry of default judgment against that entity. Because those fees were reduced to judgment in the default proceeding, and because the court has already entered a judgment against IFC binding it to pay that amount, IFC argues that its liability for fees is closed and no additional fees for post-default litigation can be awarded. IFC also contends that, even if such fees should be awarded, the bills submitted by Drill South are unreasonable and include charges for activities for which IFC should not be forced to pay. The court will address each of these arguments in turn.

---

[3] Several affidavits, including this one, were submitted to chambers as attachments to a brief on the fees petition, and apparently have not been filed into the court's permanent record. The parties may wish to correct this oversight prior to appeal.

4

### A.    Drill South's Right to Additional Fees.

By letter to this court dated October 27, 1998, IFC advanced the argument that Drill South is not entitled to any additional fees past those originally awarded as part of the default judgment against Enviro-Group. The court is unpersuaded, but will provide a brief summary of its analysis on this threshold issue before proceeding to the difficult task of assessing the appropriate amount of the fee award.

IFC's argument implicates the somewhat unusual status of attorneys' fee claims under the Miller Act, 40 U.S.C. §§ 270a, 270b. Claims for such fees are matters of "purely federal law." *United States ex rel. Carter Equipment Co., Inc. v. H.R. Morgan, Inc.*, 554 F.2d 164, 166 (5th Cir. 1977); *see F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 127 (1974). Federal decisional precedents that have interpreted the Miller Act make it clear that the Act does not in and of itself allow for the recovery of attorneys' fees. *See F.D. Rich,* 417 U.S. at 130-31. It does nothing, however, to hinder the enforcement of a fee-shifting provision contained in a freely negotiated contract between a Miller Act plaintiff and defendant. More importantly for our purposes, the Act actually extends such clauses to bind Miller Act sureties who were not parties to the original contracts. Thus a fee provision in a contract between the subcontractor and general contractor is "enforceable under the Miller Act . . . against the contractor . . . and its surety." *See United States ex rel. Southeastern Municipal Supply Co., Inc. v. National Union Fire Ins. Co.*, 876 F.2d 92, 93 (11th Cir. 1989) (discussing the analogous case of a contract between a supplier and subcontractor and enforcing a fee provision against the prime contractor's surety); *United States ex rel. C.J.C., Inc. v. Western States Mechanical*

5

*Contractors, Inc.,* 834 F2d 1533 (10th Cir. 1987) (holding the surety liable for fees to subcontractor).

The logic at work here is simple enough. A contractor's promises to pay costs and attorneys' fees incurred in enforcing a subcontract is just another benefit provided by the terms of the contract which the surety has undertaken to guarantee. Payment of such expenses "form[s] a part of the consideration which [the contractor] agreed to pay for services performed" by the subcontractor. Thus "[i]f the [subcontractor is] to be 'paid in full' the 'sums justly due'" to it, "these items must be included." *United States ex rel. Sherman v. Carter,* 353 U.S. 210, 220 (1957) (applying this logic to award fees where a contractor's employees sued the Miller Act surety); *see Morgan,* 554 F.2d at 166 (recognizing that *Carter's* principles apply to various Miller Act situations).

Into this straight-forward analysis IFC attempts to inject uncertainty by suggesting that a distinction should be drawn between fees incurred in litigation directly against the contractor itself, and those expended to force the surety to pay the sums owed by the contractor. With this distinction in mind, there are two ways to view the meaning of the subcontract's promise to pay fees, the promise which the Miller Act makes that of the surety. First, there is the view that the Miller Act would construe such fee-shifting agreements as promises to pay any fees incurred by the insured in litigation *with the other party to the contract.* Under this view, the surety would be responsible to pay the same amount required of the insured, i.e. the fees incurred before judgment is rendered against the contractor. It is this view that is advanced by IFC. A broader view, however, would see a fee provision as a promise that the entire contract balance would ultimately be recovered,

6

undiminished by litigation expenses. *Compare F.D. Rich*, 417 U.S. at 128 (rejecting this argument in the absence of a contractual agreement). If this is the promise to which the Miller Act binds the surety, then the surety would be responsible not only for the funds expended on litigation against its principal, but also for the costs generated by its own disinclination to pay.[4]

The court inclines to the latter view. While few cases have addressed the issue, presumably because sureties and their principals are rarely engaged in prolonged litigation separately, the controlling precedent in this circuit makes no mention of a distinction between fees incurred in litigating against a party to the contract and those directed against the surety. There is certainly no mention of allocating the fees in on-going litigation between these two categories, although even when both a contractor and a surety are active defendants there may be some issues which implicate one and not the other. Thus this precedent seems to support the view that fees for litigation efforts directed against the surety alone are also recoverable.

More importantly, perhaps, the broader view of the purpose of fee agreements seems to the court a more accurate assessment of what these agreements are meant to do. Fee-shifting clauses ensure that a subcontractor will receive the full benefit of the bargain it has made, just as if the contractor had paid the amount due on the contract according

---

[4] The court presumes that this question is properly one of federal law, resting not on the precise language of the contract but on the overall approach taken by the Miller Act to attorneys' fee agreements. However, if the actual language matters, in this case it would seem to suggest that IFC should shoulder the burden of litigation expenses against any entity resisting payment under the subcontract. ¶ 21.2 of the Drill South/Enviro-Group subcontract provides that "[i]n the event any action is taken by a party to this Agreement to enforce its terms, including the commencement of . . . litigation, all reasonable attorney's fees . . . shall be paid or reimbursed by the other party." This broad language suggests that the purpose of the provision was to provide payment in full, without offsetting expenses from necessary legal action of any kind.

to its terms. That is to say, without requiring the other party to engage in litigation. A Miller Act plaintiff, by virtue of the same promise, is entitled to the same benefit. This is the core function of a Miller Act surety, to ensure that the result will be the same whether or not the contractor can pay its own judgment.[9] Requiring payment of the fees necessary to obtain the funds due from the surety is therefore consistent with the basic purposes of the Miller Act and with the liberal interpretation properly applied to such a remedial statute. *See Carter*, 353 U.S. at 216. The one decision of which the court is aware which dealt with a similar issue came to the same conclusion. *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 336 (4th Cir. 1996) (holding that a surety can be held liable for such fees even where the original party to the contract did not contest liability and no fees were awarded against it).

The court therefore finds that Drill South is entitled to recover the additional costs and fees it incurred in attempting to bind IFC to the default judgment entered against Enviro-Group. The court will now turn its attention to the proper amount of those fees.

**B.     Standards Governing the Fee Award.**

As discussed above, attorneys' fees in Miller Act cases must flow from contractual fee provisions - they form part of the original benefit of the contract. However, the reach of these provisions is extended to encompass sureties by the force of the Act itself. Thus such claims are basically hybrid in nature - they rest on contract provisions made

---

[9] As the Supreme Court has pointed out, the Act does not remove the sting of ordinary business litigation when no contractual protections are provided. Litigation costs are problems which a plaintiff who has not negotiated for contractual protection would face whether or not a surety stood behind its prime defendant. *F.D. Rich*, 417 U.S. at 128-131. The Miller Act plaintiff gets no special treatment when it comes to fees. Likewise, however, the Miller Act plaintiff should get the full protection of the fee-shifting agreement it contracted for.

8

applicable by federal statutory law. The court therefore must determine whether federal or state law will govern the amounts of such fees and costs.

There are two basic possibilities, federal law applied via the Miller Act and state contract law. The principles of the Miller Act obviously are implicated by any fee award in this case and, as already noted, "[t]he question of attorneys' fees in a Miller Act action is a matter of federal law." *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1542 (10th Cir. 1987) (citing *F.D. Rich*, 417 U.S. at 127). While the relevant cases, "do not offer a clear statement of the law that applies," at least one court that faced the issue leaned toward federal law on this basis, though without reaching a definitive decision. *Id.* at 1549 & n.7. On the other hand, even in Miller Act cases federal courts have generally been willing to import state law to control general contract issues tangential to the Miller Act's concerns. *See, e.g.*, *United States ex rel. Shields, Inc. v. Citizens and Southern National Bank*, 367 F.2d 473, 477 (4th Cir. 1966). Thus where "[t]he issue does not involve any construction of the Miller Act, to which federal law would apply, but involves performance" of a contract, state law may apply. *United States ex rel. Aucoin Electric Supply Co. v. Safeco Ins. Co.*, 55 F.2d 535, 540 (5th Cir. 1977); *see United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 674 (11th Cir. 1987) (state law governs material breach of contract determination even in Miller Act case); *United States ex rel. Mobile Premix Concrete, Inc. v. Santa Fe Engineers, Inc.*, 515 F. Supp. 512, 515 (D. Colo. 1981) (state "law determines the terms of the contract, while federal law determines whether, and to what extent, the claim is cognizable under the Miller Act").

Though the result is far from clear, this court tends to the view that state law should control the amount of attorneys' fees awarded. While the Miller Act's interests are obviously implicated in the question of whether and when a surety will be responsible for fees at all, so that federal law governs this question, *see United States ex rel. Southeastern Municipal Supply Co., Inc. v. National Union Fire Ins. Co.*, 876 F.2d 92, 93 (11th Cir. 1989), no particular interests of the Act seem to bear on the proper standard of review for a fee application. The awards are, after all, based on plain contract language, and an award against a surety should match up with the award which would be made in a claim against the contracting party itself. There seems to be no reason for the Miller Act to alter the usual state law rules, which can provide consistent answers to these general questions of contract law whether the defendant is the surety or the contractor itself. If forced to choose, therefore, the court would likely apply the relevant state contract law -- here that of the State of Indiana.[8]

Fortuitously the attorneys' fee rules applied by the federal courts are quite similar to those favored by the courts of Indiana. The few nuanced differences which may exist appear to make no practical difference in an inquiry as fact-based and equitable as is the award of fees. Therefore the court need not and does not reach a final decision about the

---

[8]It is not clear exactly what the "lex loci contractus" was, though it was presumably either Indiana or Alabama. However, while the contract was performed in Alabama, the parties chose the law of Indiana to govern their bargain. *Contract Agreement*, ¶ 21.1. With exceptions not here relevant, Alabama law "recognize[s] the right of parties to an agreement to choose a particular state's laws to govern that agreement." *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala. 1991). Thus it appears that Indiana law would govern the contract in any event.

proper choice of law, but will simply apply the common rules shared by Indiana and federal jurisprudence.

Both the Indiana and federal systems require the court to approach a fee award based on a laundry-list of factors. The federal fee rules indicate that a court should consider: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Analysis typically begins by calculating the so-called "lodestar" amount, calculated as the number of hours reasonably spent times a reasonable hourly rate. See *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (this is the "most useful starting point"). In determining and adjusting this figure, special emphasis is placed on the results obtained. *Id.* at 434-435; *Canup v. Chipman-Union, Inc.*, 123 F.3d 1440, 1444 (11th Cir. 1997). The Indiana courts apply a virtually identical list of factors to both statutory and contractual fee awards.[1] *See Valparaiso Technical Institute v. Porter County Treasurer*, 676 N.E.2d 419-21 (Ind. Ct. App. 1997).

---

[1]Alabama's approach is also quite similar. *see Peebles v. Miley*, 439 So.2d 137 (Ala. 1983).

The court will discuss one additional refinement in passing. The cases sketching out the federal approach to fees mostly involve express statutory fee provisions. While they provide useful guidance for contractual cases and for the hybrid fee claims created by the Miller Act, *see United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1550 (10th Cir. 1987), at least one federal court has suggested that a less intrusive approach should be taken to the assessment of contract-based fee claims, including those spawned by the Miller Act, than to purely statutory claims. *Id.* at 1549. Thus, for example, courts should be more reluctant to trim the fees in a convoluted case to resemble those in an "ideal" case in which time was not wasted on extraneous side issues. *See id.* Rigorous application of the principles of *Hensley*, for example, which require a court to exclude time spent on claims and issues on which the plaintiff did not ultimately prevail, might not be proper in a contract case. The court agrees that some subtle difference in emphasis might be warranted between the approach taken to the discretionary provisions found in a statute and to the mandatory contractual fee provision involved here, and will keep this in mind in its analysis. However, the court has been instructed by that same contract to identify "all *reasonable*" fees. *Subcontract*, ¶ 21.1 (emphasis added). Some discrimination between legitimate claims and arguments and those which perhaps should not have been made is certainly appropriate in any assessment of reasonableness. The proper difference in approach is at most a subtle one. *See also Valparaiso Technical Institute v. Porter County Treasurer*, 676 N.E.2d 416, (Ind. Ct. App. 1997) ("In considering the reasonableness of an attorney's fee, it makes no

12

difference whether the obligation to pay the fee is based on a statutory provision or on a prior agreement.").

### C.   Application of the Relevant Factors.

In making its assessment, the court will start with a lodestar figure, based on the number of hours spent times a reasonable hourly rate, and then adjust this figure to account for the exigencies of the particular case. *See Jones v. Central Soya Company, Inc.*, 748 F.2d 586 (11th Cir. 1984) (approving this practice); see *Hensley,* 461 U.S. at 4433 (this is the "most useful starting point"). This approach is sensible in part because many of the relevant factors, including the labor required, the difficulty of the questions presented, and the preclusion of other employment are directly or indirectly reflected in the hours actually spent on the case. *See Bailey v. Heckler*, 777 F.2d 1167, 1170 (6th Cir. 1985). Thus the lodestar can be presumed to account for all of these factors, with modifications for the degree of success being the only change required in most instances. *See Norman v. Housing Authority of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).

#### 1.   Number of Hours.

Much of the dispute over fees centers over the amount of hours Drill South's counsel should reasonably have spent in the prosecution of its claims. IFC launches a two-pronged attack, contending both that specific hours were improperly spent or improperly billed, and that as a whole the amount of fees sought is disproportionate to the underlying amount at issue in this case. Based on the latter argument, IFC suggests that whole-sale reductions should be made in the amount of fees awarded. The court will address this latter issue before turning to an assessment of the detailed fee submissions by Drill South.

13

The court must admit in all candor that it has been offended by the amount of legal effort which has been spent on a relatively small and simple construction claim–one on which the primary culprit was adjudged in default. The fees sought are, in any practical sense of the term, exorbitant and wholly disproportionate to the ends sought by the plaintiff in this action. However, the court has neither the power nor the inclination to drastically reduce the fees owing to Drill South on this basis. As a matter of fairness, IFC's plea fails because its own lawyers did as much, if not more, to create the muddle this case became as did Drill South's attorneys. To coin a few phrases, "it takes two to tango," and IFC, having "danced the dance," after having assumed the obligation to pay, is faced with the "fiddler's bill." Hopefully, it was a fine dance. It certainly was an expensive one.

As a legal matter, the court has not uncovered any authority allowing it simply to chop the fee award to account for the small amount of money at issue here. While such adjustments are permitted in the federal courts based on the "results obtained," *see Norman*, 836 F.2d at 1302, the Eleventh Circuit has made it clear that this term refers mainly to the amount of damages received *relative to that sought. See id.* at 1302, 1306 ("[T]he court must take into account the significance of the results obtained in relation to those sought."). Here, Drill South has received about what it asked for. It just didn't ask for that much. Thus adjustment based on this principle does not seem proper.

It is true that both the federal and Indiana courts recognize the amount involved as an appropriate factor to consider in assessing the reasonableness of fees. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *Valparaiso Technical Institute v. Porter County Treasurer*, 676 N.E.2d 419-21 (Ind. Ct. App. 1997). However, like the other

14

*Johnson* factors, this one seems useful principally in determining the appropriateness of particular hourly charges. If the hourly charges are proper, the court doubts that this factor can or should be used to make additional cuts in the fees to be awarded. The amount at issue, after all, is only one factor to be considered in assessing a case. As this case demonstrates, a small case can, with effort, be inflated into a major conflict. Sometimes this may be the fault of the lawyer seeking fees. If so, a review of the hours billed should reveal this, and proper deductions can be taken. If not, there seems no reason to foreclose a fee claim because the amount at issue is small.[8] This factor, like the rest, is thus subsumed into the calculation of the lodestar in most instances. *See Nelson*, 836 F.2d at 1299 (lodestar "presumptively includes" this factor). The court thus doubts that it has the power to adjust the fee award solely on the basis of the amount at issue.

That being said, the court will bear in mind the amount at issue in assessing the time spent by Drill South's attorneys on particular tasks in this action. Rigorous research and analysis and thoroughness of preparation are certainly attributes which lawyers should honor and cultivate and are to be commended. That principle, however, does not excuse the lawyer who, without regard to the stakes at issue, consumes his client's resources inordinately. In such cases, the court must adjust the claimed hours to more fairly approximate the effort that would be reasonable based on the size and complexity of the case. Given the size of the fee requests and the relatively small amount at issue, the court is satisfied that some mistakes were made in this regard. It will therefore be alert to

---

[8] Moreover, litigation sometimes is about more than mere money. Make no mistake though about this case. This was about money and nothing else.

examples of overzealousness while engaging in the detailed analysis of Drill South's hourly billing that follows.

The court will organize that analysis based around the various categories of work performed by Drill South's counsel as set forth in the parties' submissions, and particularly in Plaintiff's Exhibits 3 & 4 to the evidentiary hearing. The allocation of hours contained in Plaintiff's Exhibit 3, in particular, seems to the court after a thorough review to be sound enough for most purposes. With minor modification, the court will use it as a basis for calculations.[9] The court will also address the "problem" types of billing entries addressed by IFC, which involve work in various categories to which IFC poses common objections. These objections, along with some of Drill South's responses, are reflected in Plaintiff's Exhibit 4, as well as in various submissions by IFC.

The court notes before delving into details that counsel tend to lump all of a day's time under one description, although various tasks may have occurred on that day. To the extent that this block-billing makes it difficult to determine "with sufficient particularity" "the general subject matter of the time expenditures," *Nelson*, 835 F.2d at 1303, the court will make the most accurate allocation it can. However, because the plaintiff bears the burden of proof on this issue, the court must give IFC the benefit of the doubt in making such allocations. While this allocation may sometimes seem unfair to Drill South, this simply

---

[9] While the court has re-allocated time in a number of instances, either because the court disagreed with the proper characterization of the work done or because the court felt that the allocation of block-billed time between various activities was incorrect, in most cases the court has accepted the allocations from Plaintiff 's Exhibit 3 after reviewing the actual billing records. In some cases the court has noted possible discrepancies, but made no re-allocations because the changes would have no effect on the ultimate award.

16

cannot be helped. The court suggests to counsel that in the future more accurate billing practices may result in more accurate fee awards.

### a.   IFC's Problem Categories.

Besides objecting to the amount of time spent on discrete tasks by Drill South's attorneys, IFC contends that certain types of activities are not billable at all. In particular, IFC contends that Drill South cannot properly recover at full rate for travel, for work that a paralegal or other staff member could have done, for time spent in meetings between two or more Drill South lawyers, and for work on unsuccessful legal claims and issues. IFC also complains that fees accrued before default was entered against Enviro-Group should have been dealt with then, and cannot properly be raised now. These objections, which cut across the various types of work done, will be dealt with first.

### (1)   Pre-default Fees.

As noted above, Drill South has already been awarded the fees reflected in the default judgment against Enviro-Group. These fees were set based on an affidavit from Drill South's president. It appears that this affidavit did not include some fees which had already been accrued, but not yet billed to Drill South, at the time of the default. Drill South seeks to recover these additional fees now.

The court agrees that it cannot now award such pre-default fees. Fees which could properly have been charged to Enviro-Group should have been made a part of the judgment against Enviro-Group, either by supplementation of the damages evidence prior to default or by a subsequent motion to alter judgment. If Smith and Fleming's billing cycle created a problem in this regard, its attorneys should have been aware of this problem and

17

taken action to correct it. They cannot do so now. The fees, as they relate to the direct litigation against Enviro-Group, have been fixed. That chapter is closed and the court is unwilling to re-open it.

However, in the court's view certain fees accrued prior to April 7, 1997, the date of the entry of default, can still be recovered because they have nothing to do with the direct claims against Enviro-Group. Therefore they could not have been included in any previous award. Specifically, the court notes that some 12.2 hours were spent before the default was entered researching the next step–the application of the default against IFC. Likewise, approximately 1.7 hours was spent preparing for mediation, 1.8 hours on discovery related to IFC, and 1.3 hours researching a motion to strike IFC's cross-claim. These expenses were all incurred in litigation directed at IFC, not Enviro-Group, and so properly belong in this motion for fees, not the previous one. With these exceptions, however, the court concludes that all fees incurred on or before April 7, 1997 must be excluded from Drill South's recovery.

### (2)   Travel Time.

Both the court and, apparently, Smith and Fleming, agree that an attorney should not bill at full rate for travel time in which no legal work is done. *See, e.g., Weinberger v. Great Northern Nekoosa Corp.*, 801 F. Supp. 804 (D. Me. 1992). Peter Crofton, Smith and Fleming's senior associate on this case, testified at the hearing that it is his firm's policy not to charge for travel time at all. A review of the dates on which Smith and Fleming's billing records show travel reveals that no travel time was billed in many instances. However, in a number of cases the other work done on that day does not appear to account for the full

number of hours billed. Even if no travel was claimed, the work done on these days simply does not reasonably merit the amount of time claimed. Therefore the court will deduct 15 hours for these problems,[10] to account for unexplained time on the 6th, 8th, 27th, and 30th of May, 1997 and the 6th of June and 29th of August that same year.

### (3) Conference Time.

IFC seeks a reduction for all time spent in attorney conferences, claiming that the time is redundant. The court is not sure it even understands this argument. Both attorneys in a conference of course bill for the same time, but so long as the conference constitutes a reasonable use of the time of both, the court is aware of no reason why both should not be entitled to be compensated for that time. Lawyers customarily and properly divide their work in a case, with lower paid, less experienced lawyers performing the field work under the oversight of more experienced lawyers. This gives a client the best of both worlds, the judgment that comes with experience combined with a lower cost for the work that requires less expertise. The lawyers must, of course, communicate with each other for this process to work. Expending time on such meetings is a perfectly reasonable and recoverable expense traded for the much more significant gains provided by the arrangement.

### (4) Paralegal Work.

IFC objects to a number of time entries on the grounds that they represent work which a paralegal or other staff member could or should have done, and should be billed

---

[10] If this was listed as travel time, the court might be persuaded to award fees at a reduced rate for this time. However, as Smith and Fleming does not bill for travel time, no such award is appropriate.

only at a reduced paralegal rate. These entries primarily reflect document management, e.g. arranging and sorting documents, and drafting and filing motions. IFC objects to some 23 hours of billed time on this basis. *See Plaintiff's Exhibit 4*, at 2.

The court obviously has a different understanding than IFC's counsel about what tasks a paralegal can be permitted to perform. In the court's view, document tasks involving selective legal judgment, for example choosing documents to review with a witness prior to a deposition, are in most cases a job for a lawyer. Lawyers, with the assistance of their secretaries, must likewise be involved in even the mundane aspects of brief writing, editing, and filing. It is neither surprising nor improper to see such entries on a lawyer's bill. Thus the court finds most of IFC's objections in this regard groundless.

However, the court has noted that a few time entries involve document management tasks which do not involve legal judgment. For example, a senior associate billed time for "review[ing] documents for documents involving Mike Lampert," for "assembl[ing] exhibits" for a premediation statement, and for "organiz[ing] documents requested . . . for copying and arrang[ing] for same." *Plaintiff's Exhibit 2*, at 5. These are classic paralegal tasks, which the court estimates consumed some 4.6 hours on April 11 and 28, 1997 and June 3, 1997.

The question then becomes whether, and to what extent, this time is recoverable. It clearly cannot be billed at a lawyer's ordinary rate. *See Johnson*, 488 F.2d at 717. However, while opinions in this circuit have from time to time indicated otherwise, the prevailing federal view seems to be that the cost for clerical work is billable as long as it is billed at clerical rates. *See Missouri v. Jenkins*, 491 U.S. 274 (1989). While the Indiana

courts have suggested otherwise in interpreting a statute allowing recovery for "reasonable attorney's fees," *see Johnson v. Naugles*, 557 N.E.2d 1339, 1344 (Ct. App. Ind. 1990), this result was based on the very precise language of the fee provision at issue. The provision here, which allows recovery broadly for "all litigation expenses and costs," *Subcontract*, ¶ 21.2, seems flexible enough to allow for the recovery of reasonable billing for clerical work. Thus recovery will be allowed for this 4.6 hours at an appropriate rate for paralegal work. In the absence of evidence from the parties, the court takes judicial notice that $40 an hour is a reasonable fee for such services.

### (5)   Unsuccessful and Collateral Issues.

IFC also seeks to have a number of hours deducted because they were spent on improper or unsuccessful arguments and claims. While the language of the relevant case law supports the exclusion of time spent on "unsuccessful claims," *see Norman*, 836 F.2d at 1302, the court suspects that this means actual failed legal theories, not unsuccessful procedural maneuvers. However, while the authority cited by the parties does not directly say so, the court believes that it does have the authority to cull out time wasted on unnecessary procedural skirmishing under its general authority to remove "'excessive, redundant, or otherwise unnecessary' hours." *Id.* at 1301 (citing *Hensley*, 461 U.S. at 434).

IFC's objections center around several failed attacks by Drill South. In connection with the parties' cross-motions for summary judgment, Drill South filed a number of motions to strike and a subpoena seeking testimony from IFC. The court denied these motions and quashed the subpoena on August 29, 1997. In the court's view, the subpoena was entirely improper and unnecessary, while the few good points raised in Drill South's motions could

21

have been made in a few hours and a few pages. Particularly in light of the amount at stake, the approximately 34.3 hours spent on this round of this "Litigation Game" was clearly excessive. The court will award fees for only four of these hours, ample to allow Drill South to make the few points it needed to make.

Drill South also objected to allowing IFC to take a set-off for funds already paid to Miller Drilling. This claim was wholly disingenuous, since Drill South had previously agreed that IFC was entitled to a set-off. Thus the court will deduct the approximately 4.2 hours Drill South spent on its objections.[11]

Drill South's counsel also apparently spent three hours attempting to impose a lien on funds held by the Corps of Engineers and 1.4 hours in preparing for a False Claims Act lawsuit. As Drill South has not demonstrated a sufficient link between these activities and the Miller Act claim which forms the only basis for the recovery of fees in this action, in the court's view fees for this time cannot be recovered under the Act.

### b.    Tasks by Categories.

This brings us to the meat of the matter, the time spent on billable legal tasks. The court will conduct its inquiry by dividing these tasks into rough categories along the lines proposed by Plaintiff's Exhibit 4, and assessing the time spent on the major tasks within each category. In the exercise of its general mandate to remove "'excessive, redundant, or otherwise unnecessary' hours," *id.* at 1301 (citing *Hensley*, 461 U.S. at 434), the court will

---

[11] The court's allocation includes time from entries on September 29th and October 6, 1998, which are not mentioned in the break-down contained in Plaintiff's Exhibit 4.

22

cull those hours which it finds improper in light of its own experience with the issues of the case.

### (1) Appeal.

Drill South seeks some 8.6 hours for work related to IFC's failed appeal. For reasons of its own IFC chose to take a premature and wholly unauthorized appeal. Drill South was required to respond to this conduct. The time billed appears to be reasonable and no adjustment should be made.

### (2) Default Judgment.

According to the court's calculations, Drill South spent some 41.7 hours[12] attempting to bind IFC to the judgment against Enviro-Group. This was a clean and efficient approach to resolving the entire litigation, and was ultimately completely successful. The hours billed appear reasonable and the court will allow full recovery for this time.

### (3) Discovery.

Drill South's counsel spent approximately 61.9 billable hours on discovery issues. Because IFC conducted most of this discovery, Drill South had little choice but to participate in it. Its counsel were essentially compelled to spend the number of hours needed to react to the discovery requests of their opponents. The hours spent seem reasonable under the circumstances. Therefore the court will award the full amount sought with one exception.

---

[12] The hours discussed here and below exclude those barred by the court's previous discussions. For example, the hours sought by Drill South under this category have been reduced because a number were accrued prior to the entry of default against Enviro-Group.

IFC noticed and took the deposition of Bobby St. John,[13] based apparently on the information provided in Drill South's initial disclosures. Those disclosures indicated that this witness would have extensive information about the case. However, the court's own review of the deposition transcripts indicates clearly that the deposition was a colossal waste of time. Both parties attempt to blame the other for the mistake of taking it in the first place. On the evidence available to the court, it appears that this problem was caused by *both* parties' failure to communicate about what knowledge Mr. St. John actually had. Because this waste was in part Drill South's fault, the court will deduct 5.6 hours, half of the time it believes counsel spent on this matter, from the total chargeable to IFC. This leaves 56.3 billable hours spent on discovery in the final fee award.

### (4)    Summary Judgment.

Drill South's attorneys spent a vast amount of time handling cross motions for summary judgment, motions which were never ruled on because of the resolution of the default issue. The court realizes that summary judgment motions are always time consuming, and that they may be quite important in some cases. However, as discussed above, some restraint should have been exercised in light of the relatively limited amount at issue in this lawsuit. No-holds-barred briefing and research may be appropriate for cases with much at stake, but part of the art of lawyering is the ability to hit the high points quickly and efficiently in smaller cases. This allows for excellent, if not encyclopedic, briefs in such actions at costs proportionate to the amount at stake. The court notes as well that

---

[13] He was not noticed as a Rule 30(b)(6) witness, as IFC contends. However, a high official like Mr. St. John can still speak for the company as to matters in which he has personal knowledge. *See United States v. One Parcel of Real Estate*, 121 F.R.D. 439 (S.D. Fla. 1988). Unfortunately, he simply did not know much.

this is a skill gained with experience, and Drill South's counsel are being paid higher rates based on their extensive experience in construction litigation. *See, e.g., Norman*, 836 F.2d at 1300-1301. This *should* have resulted in lower hourly bills.

However, on review of the billing records and the events of the case itself, the court is left with the abiding impression that the hours expended on summary judgment research and briefing by Drill South's counsel were simply too high. According to the court's allocations, Drill South seeks to recover some 30.7 hours for the crafting of its own summary judgment brief, 68.6 hours for the reply brief on the same motion, 15 hours for opposing IFC's motion, and 13.7 hours for preparing for and attending the court's hearing on these motions. These figures are well outside the bounds of reasonableness given the complexity of the issues involved. In the court's view, an award of 20, 38.6, 10, and 7 hours for these tasks, respectively, should be more than sufficient.

### (5)   Attorneys' Fees.

Perhaps the most disturbing feature of this entire situation is Drill South's claim for fees incurred in pursuing its attorneys' fees claim. About 95.1 of the hours sought are attributable to this quest, which the court notes does not include the time spent in the evidentiary hearing. Thus Drill South seeks well over $10,000, a substantial percentage of the total claim in this lawsuit, not as fees, but as fees for collecting fees. This is a litigation boondoggle of the worst kind, and proof positive that litigating fees petitions has now become a cottage industry all its own.[14]

---

[14] Assuming the amount of time, effort and paper required by the court to make its findings are not proof enough.

25

However, as best the court can tell Drill South is entitled to collect these fees. Much of the time spent was spent in successful campaigns to repel attempts by IFC to halt the award of fees. Drill South did not generate all these fees on its own, so the court supposes that in some sense it is fair for IFC to have to pay them. Given these legal challenges, along with the specificity with which the parties have attacked and defended the hours billed, the court and its staff have spent upwards of sixty man hours resolving the fees petition. Drill South presumably took this motion seriously for the same reason the court has–it amounts to an entirely separate lawsuit worth almost again as much as the one originally filed. In light of this fact, the court can well believe that Drill South spent still more time pursuing the significant funds at issue.

The Supreme Court has said that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S. Ct. 1933, 1941, 76 L. Ed. 2d 40 (1983). That, of course, is exactly what has happened here. The real problem the court sees is not with the hours actually spent, but with the whole approach taken to this and almost every other issue in the case. Attorneys' fees have turned into yet another arena for the litigation game, soaking up huge volumes of the lawyers', and the court's, time in collateral conflicts which could easily have been avoided.

However, under the circumstances prevailing in the real world of modern litigation, the court finds Drill South's counsel's bill relatively reasonable. Some over-zealousness clearly occurred, but much that was done had to be done, in response to both IFC and the demands for thoroughness now placed on fees petitions. Given the court's own

26

experiences, it feels that the hours sought are unreasonable but that 70 hours could reasonably have been spent on the attorneys' fees issues.

### (6)   Miscellaneous.

Drill South also seeks 28.6 hours attributable to a variety of other litigation tasks. The tasks appear necessary and the time spent reasonable, so the court will allow recovery of this amount.

### c.   Summing Up.

Assuming the court's math is correct, this all adds up to 280.8 hours of billable lawyer hours. Of this, 1.3 hours were billed by a junior associate and 8.2 hours by a partner, with the remainder accounted for by the senior associate.[18] An additional 4.6 hours will be awarded at paralegal rates.

### 2.   Reasonable Hourly Rate.

The parties have quarreled significantly over the proper reasonable hourly rate. Oddly, the main dispute appears to center not over what a reasonable rate should be in light of such factors as the experience of the attorneys, the complexity of the case, and the prevailing rates in the community, but over what the rate actually paid to Drill South's attorneys by their client should be under the terms of the attorney-client agreement.

In a nutshell, the problem is this. Drill South and its attorneys apparently contracted for a reduced hourly rate in exchange for a contingency fee of 10% of the money recovered

---

[18] In producing these figures the court has allocated as accurately as it could the hours on which reocvery is barred between the attorneys on the case. Excessive hours spent on research and other activities were almost exclusively spent by the senior associate, who performed most of this type of work, and have been so allocated.

27

in excess of the unpaid balance on the subcontract, or \$48,873.[18/] *Aff. of Peter Crofton*, ¶ 16. Drill South contends that the money recovered is \$151,760, i.e. the money owing to Drill South directly plus the payments IFC made to Miller Drilling, which offset Drill South's judgment because they discharged debts owed by Drill South to Miller. IFC argues that, because Miller Drilling has its own lawyers and obtained its own judgment, IFC should not be forced to pay Drill South's attorneys for work they did not do.

IFC's argument misconstrues the nature of the attorneys' fee inquiry. There are really two questions implicated by Drill South's contingency fee agreement. The first is what fee Drill South and its lawyers independently agreed to. The second, and completely separate, question is whether the resulting fee generated by that agreement is fair to IFC. Only the former inquiry is implicated here, and in the court's view IFC has very limited standing to meddle in this question. Within ethical limits, Drill South and its lawyers could agree on any fee structure they wanted to, based on any marker of success. These decisions simply are not IFC's business.

Here, the court sees no problem with Drill South and its attorneys' interpretation of their own agreement. Both Drill South and its counsel agree that Miller Drilling's recovery should be included in calculating the contingency. While this is not the only way to set up the agreement, as far as the court can tell this is a perfectly legitimate interpretation of the agreement which does exist. There is nothing to suggest otherwise. Thus IFC is not in a

---

[18/] IFC contends that this figure is not supported by the record. However, assuming that the term means the face value of the contract, not counting later change orders, less benefits already paid by Enviro-Group, the court's pretrial order, entered June 10, 1997, did indeed establish this figure as \$48,872.50. This seems a reasonable interpretation of the term, and is apparently the one intended by both Drill South and its counsel. Therefore the court will use Drill South's numbers.

28

particularly strong position to question the construction offered by both parties to the fee agreement. While IFC would be entitled to raise concerns if a plaintiff which had one fee agreement with its lawyers changed to more favorable terms once it appeared that the defendant might have to bear the cost, there is simply no evidence of that here.

IFC's questions about the fairness of the contingency agreement are not well taken because the question of fairness is dealt with as part of an entirely separate analysis. Both federal courts and Indiana state courts disregard contingency schemes in calculating fees, and apply the lodestar multi-factor reasonableness analysis without regard to the contingent nature of the fee agreement. *See City of Burlington v. Dague*, 505 U.S. 557 (1992). The key question is whether the rate actually charged is reasonable in light of the work done and hours spent. *See Valparaiso*, 676 N.E.2d at 420-21 (contingent fee award will be approved if, and only if, there is "objective evidence of reasonableness" under the usual fee factors). "The party who stands to be awarded attorneys fees . . . must be content with reasonable . . . fees based on traditional factors." *Mason v. Mason*, 561 N.E.2d 809, 811 (Ind. Ct. App. 1990). The amount actually paid by the plaintiff, including the contingency, thus serves only as the starting point in a fees request. IFC cannot quibble with the terms of its opponent's attorney-client agreement, but certainly could claim that the resulting fee award, expressed in terms of hours and hourly rates, is too generous.

IFC has not really done that, however. Smith and Fleming charged Drill South a rate of $140 an hour for work by partners, $115 an hour for senior associates, and $100 an hour for junior associates. *Aff. of Peter Crofton*, ¶ 4-6. When the contingency fee of $10,288.70 is spread out over 279.8 hours of work, this yields an added effective hourly rate of $36.77

an hour, for a total partner billing rate of $ 176.77 an hour, senior associate rate of $ 151.77 an hour, and junior associate rate of $136.77 an hour. IFC has not directly contested these rates and has presented no evidence on what a reasonable rate is. Drill South, however, submitted evidence that rates of $130 to over $200 an hour for partners and $90 to $150 an hour for associates are within the usual range for this type of work in Birmingham. *See, e.g., Aff. of James Huckaby*, ¶ 5.

This court's own experience confirms that Drill South's expert's estimates are close but a bit over-generous on the high end. In particular, given the relatively simple nature of the case and the moderate level of work quality the court has seen, the court does not believe that an effective rate of over $150 an hour is appropriate even for an experienced associate. Young lawyers, even skilled and experienced ones, who still need expensive oversight by more senior attorneys cannot reasonably command the same rates as partners who are ready to perform on their own.

The actual rate charged, which exceeds the higher bound set by even Drill South's own witness, is excessive. The court finds confirmation in the fact that Smith and Fleming charges less than this in non-contingency cases, billing at a rate of $145 an hour for senior associates, and that is in an Atlanta legal market with rates slightly higher than those prevailing in the local market. In light of the quality of the work it has seen, the evidence of record, and the court's own experience with rates in the Birmingham market, it finds that a rate of $140 an hour would be the maximum reasonable rate for even an experienced associate under the circumstances. The junior associate rate must also be reduced to $120 an hour. The court finds the partner billing rate somewhat high but not unreasonable.

30

### 3.  Other Factors.

In light of the rate and hour information computed above, the court's lodestar figure for this case rests at $39,587.51. In determining whether to alter this figure, the court has considered all of the factors which bear on the reasonableness of fees under federal and Indiana law. It sees nothing unusual about the case, and finds that the relevant factors have all been properly accounted for in the careful computation of the lodestar performed above. No adjustment to that figure is necessary. Thus the court finds a fee of $39,587.51 reasonable under the circumstances.

### D.  Other Expenses.

Drill South also seeks almost twenty thousand dollars in total expenses, falling into two main categories. First, Drill South asks for the costs[17] expended by its lawyers in the prosecution of this lawsuit. According to the court's calculations based on the billing records submitted along with the affidavits of Bobby St. John and James Huckaby, $1,570.98 was spent on copying, $1,708.76 on computer research, $1,612.72 on travel, $1,275 on mediation fees, $743.60 on long distance, fax and express mail, $1502.07 on court reporting services, $570 for expert witness fees, and $50 on process servers, for a total of $9,033.13. These non-legal services can reasonably be billed by counsel only at cost. With that in mind, the court finds fault with the amount sought for copying, faxing and mailing, and computer research.

---

[17] For reasons already discussed, expenses incurred on the claims against Enviro-Group cannot be recovered now. Because Drill South has not (and probably cannot) prove which of its expenses prior to the default were spent in this way, the court will include in its calculations only expenses billed for the period beginning in April of 1997.

31

As to the copying, the court cannot imagine that the relatively small number of documents at issue in this case could generate this much copying, even when the enormous number of pages disgorged by the lawyers themselves is included. Either too many useless copies were made or the copies were billed at too high a rate. The evidence presented by Drill South does not allow the court to determine which, but more importantly it does not convince the court that a reasonable amount has been charged. $500, allowing 5000 copies at a generous rate of 10 cents a copy, is a more than sufficient copying charge.

The phone, fax and mail charges also seem excessive. The court realizes that some of the expense was generated by a long-distance telephonic deposition, and some by other necessary telephone calls. However, it appears to the court that express mail and long-distance fax was simply overused. Ordinary mail should sometimes do, even for lawyers, particularly when a case is small. Making its best guess to account for this problem, the court will allow recovery of $500 for these costs.

As noted above, the court believes that Drill South's counsel researched their legal positions in this case with a leave-no-stone-unturned and no-sword-uncrossed zealousness that was simply disproportionate to the amount at issue. Thoroughness is good, but a sense of proportion is also essential.

The court estimates that a quarter to a half of all the time spent on research was excessive and unreasonable. Presumably, some of this excess time was spent on computer research. Hence the court finds only $1,280, or about three-quarters, of the computer research costs sought are reasonably recoverable.

32

The remaining expenses appear to be fixed and relatively unavoidable. Hence the court finds them reasonable. The court will allow recovery of $7,289.79 in attorney expenses. As already noted, $184 in billing for clerical tasks may also be recovered.

Drill South also seeks to recover $8,017.50 for the time its own employees spent engaged in this litigation. As the court reads the subcontract language, which allows recovery of "attorney's fees, litigation expenses and costs," *Subcontract*, ¶ 21.2, the amounts sought must be expenses paid out of pocket. Internal costs to the company of the time spent on litigation should therefore not be recoverable. Most of the few opinions the court has found touching on this issue seem to agree. *See, e.g., Burger King Corp. v. Mason*, 710 F.2d 1480, 1499 (11th Cir. 1983) (discussing Florida law). Therefore the court will not allow recovery of these amounts.

**IV. Totaling the Damage.**

On this record, the court concludes that Drill South is entitled to additional $39,587.51 in attorneys' fees, plus $7,473.79 in additional costs, for a total of $47,061.30. The judgment against IFC will be modified to so state. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this  $\partial 7^{th}$  of January, 1999.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

33